Our first case is number 25-1831, Johnson & Johnson v. Samsung Bioepis. Glasser? Good morning, Your Honor. Lisa Glasser on behalf of the Janssen plaintiffs. May it please the Court, with the panel's permission, I'd like to reserve three minutes for rebuttal.  Your Honors, the District Court's finding of no irreparable harm was premised on multiple independent, pure errors of law. I'll focus primarily on two subject to questioning. The first being the District Court's application of an improperly elevated standard, this impossibility or incapable of calculation standard. And the second being the District Court's failure to recognize an entire category of irreparable harm, that being the loss of negotiating power or negotiating leverage. Turning first to the standard, this circuit as well as its sister circuits are clear. There is no requirement for a plaintiff to obtain a preliminary injunction to establish that damages would be completely impossible to calculate, that no damages could be calculated. That's very, very important for this case. It's also just fundamental to our systems of equity. On my count, the District Court mentioned impossible four times. Do I have that right? That sounds about right. They also used other terms. Before we talk about something else, let's stick with that. Twice the court was quoting Dr. Popovian's declaration. That's the Appendix 26, correct? That sounds right, Your Honor. Okay, and once the court was referencing Janssen's argument that damages would be impossible to calculate. That's at Appendix 28, correct? Correct. Okay, and then once it was quoting a District Court case granting a preliminary injunction where it would be impossible to calculate damages. If I'm correct that those are the only four times impossible was mentioned, how can you accuse the District Court of applying the wrong standard in light of the context that I just described? So Appendix 28, Your Honor, the District Court specifically stated that Janssen was required to support that calculating damages would be impossible. But I think the most important one by far is on Appendix 21. The reference on Appendix 21 is where the court actually states the court finds that plaintiffs have not shown that their damages would be incapable of calculation. All right, well you just pivoted to incapable, so we can set impossible aside and let's focus on incapable then. Tell us why the District Court's mention of incapable meant that it applied the wrong standard. No, absolutely, Your Honor, and I think the two are used interchangeably in the opinion, but whether we're talking about... Well, we just described the four uses of impossibility, so unless there's some other besides the four that we just talked about, can't we set that aside? Sure, there's also the reference on Appendix 25, plaintiffs bear the burden of establishing that monetary relief would be unquantifiable, another synonym for impossibility or incapability. And then additionally, on page 32, we have the District Court citing favorably a case that was dicta in a District Court stating that it's proper to find no irreparable harm, even where damages calculation would be difficult, so long as calculating damages is feasible. And so again, we don't need to use the word impossible necessarily. To me, these are synonyms, but each of them is clear error. Focusing perhaps on the very last one, where the District Court noted that merely a showing of feasibility is sufficient, even if it's difficult, that's directly contrary to numerous holdings from this Court, including, for example, the BP case, which specifically stated that difficulty is the relevant standard. But both as to the standard and things like market share, you seem to be looking at cases that involve reputation and goodwill. There, and BP is one of them, we're using language like difficult. But where we're talking about contract and monetary damages that are for breach of contract, why isn't feasibility the right standard? So feasibility isn't the standard. I'd like to talk about two cases that highlight that, I think, in the papers, which is 22nd Century and the Novartis case. But the reason why feasibility isn't the right standard, regardless of whether we're talking about a contract or we're talking about someone's reputation, is the exact same principle. The whole point of the preliminary injunction is that when damages are very difficult to calculate, one, and two, you're actually creating a change in someone's circumstance. Whether you're ultimately changing the overall construct of a market in a negative way, or you're changing somebody's relationship, the point of the irreparable harm is you can't ever unwind that after the trial. And we don't want to put the burden on the plaintiff, where we know that it's going to be at least very, very difficult to calculate damages, and we know that even if we award damages, you're never going to be able to undo what has occurred and put the plaintiff back into a situation that they're going to be in. That's true whether we're talking about a business construct. That's true whether we're talking about an individual person and their reputation. Briefly, to touch on Your Honor's point, having to do with the 22nd Century case, that case is not about just a reputation. That case is actually specifically focused on the idea of what projects would be awarded and what bids would be accepted. It's actually highly analogous to our situation here, where a lot of the problem is we actually don't know what the market would have looked like in the absence of the breach, because we do not know exactly what moves all of the competitors would have made in that construct. We don't know exactly what hit to the formulary status is going to be agreed to be attributable to this factor. And so very, very similar to 22nd Century, we have a situation where you can absolutely isolate some specific financial harm. We will be able to get back some money at the end of this trial, but it is extremely difficult to try to capture the whole thing. And even if we did get a large award, like the I4I case is a good example. They got a $200 million award. And the Federal Circuit, ultimately affirmed by the Supreme Court, said the fact that they got money doesn't change the fact that now their market has been completely disrupted. So they were ultimately awarded a permanent injunction in that case. So that's exactly what we're dealing with here. And I will submit to Judge Hardiman's question about, well, the label we put on it, right? Incapability or impossibility or otherwise. We know from the facts that the district court found that the district court should have reached a different conclusion if they were applying the proper standard, which is difficulty. Because the district court actually noted, there's no debate here about credibility or about whether the factual findings were acceptable. The district court specifically found calculating the market share part of it wouldn't be easy. The district court also found that there's this presence of other biosimilar competitors. The district court actually, this is on Appendix 27, specifically noted that there's a very complex pricing model when you're dealing with biologics. And then ultimately, I think even the most important unique factor in this case, the district court actually noted that the specific form of market disruption here, the fact that we have a new phenomenon that started in 2023 and has scarcely been tested other than in a few pretty disastrous instances, which is this private label controlled by a health care conglomerate. The district court specifically cited with favor the finding that this is a new phenomenon. It impacts the district court acknowledged huge swaths of the health care sector. But why isn't that just the stuff of experts? And I mean, the standard of difficulty would mean that getting injunctive relief was the rule instead of the exception, where it can be calculated with the assistance of experts. Why isn't a monetary damage sufficient? And here the district court concluded, based on the expert testimony that it heard, that it was more persuaded by McDuff than by your expert. So when we're reviewing for abuse of discretion, doesn't even the standard of review do that work? Well, we're applying the wrong standard, of course. An error of law is an automatic abuse of discretion. And I do think that is what occurred here. The district court didn't disagree with any of the facts that I just mentioned. The district court didn't disagree. Actually, in fact, affirmatively found it's a complex pricing scheme, that this type of market disruption had never before occurred. The district court found, in fact, it wouldn't be easy. And so we have two things. One, trying to calculate out the damages is very, very difficult. And we don't want to put that entire burden on the plaintiff, the wronged party. The second part of it, though, is equally important, which is you can never put the market back where it was. And so even if we employ the world's best economist and the jury adopts everything our economists do. Is that the harm? Does the market have to go back where it was? Isn't it possible that the market would shift irrevocably, but you could still be made whole by money damages? Just use round numbers. Say that you had 50%, and the market shifted irrevocably to where your client had only 20% of the market. That's a huge diminution. But that 30% can be measured in money damage. Yeah, in a highly simplified market, that's true. Here, due to the relationships, I think it's not, and that really wasn't disputed. I mean, sort of turning, or at least relating this all to the negotiating leverage point. The district court just completely dismissed this entire category of irreparable harm. And it perfectly illustrates what we have been dialoguing about here, which is to say, we know that there's going to be, our expert referred to it as this sort of Damocles, right? Now, instead of having a regular negotiation with the pharmacy benefits managers, we're having a negotiation where we know they control their own biosimilar, and they can take us off the formulary at any time. Same thing happened with Humira, though. That's right. Right, and Dr. Popovian's declaration measured what the loss was. He absolutely did not measure the loss whatsoever. The only numbers in there he was able to isolate are what their market share was before and what it was after. Neither he nor anyone else was able to quantify what was the result of that, what was the actual financial loss associated with the fact that they had been moved to this first off the formulary and then to this less favorable portion of the formulary. They had essentially lost control over their own pharmaceutical. Dr. Popovian did not even attempt in that declaration to try to put a number on that, nor did the opposing experts. Calculate the percentages. He just didn't go the next step and say what the percentages reflected in real dollars. I respectfully disagree. He calculated the percentage of the actual market share. He did not calculate the percentage of the market harm, which is what we're talking about here. It's your position that market share can't be then converted into real dollars? It ultimately requires a very complicated model in order to do that when you're talking about a situation where you have multiple different players coming in and out. Does that mean it can or can't be calculated in money? You can absolutely, as we told the district court, you can absolutely put together a model that tries to do that. You can probably capture some good portion of the prior damage at least. You can never accurately capture the whole extent of that going forward. And I think the point of the difficulty standard, too, is we don't want to put that burden on the wronged party. There will obviously be some sort of a fight about what model comes in, what model comes out. It's extremely difficult to calculate. Is your position that to be true to Novartis, any time a plaintiff establishes the loss of market share, there is irreparable injury? I don't think that's true. I mean, you could have a very simplified market where somebody could calculate that potentially. Novartis being a great example, though, because Novartis court actually noted they used the word measurable. They actually said that the loss was measurable in the Novartis case. And the court said it's still irreparable. It's irreparable because we're in a market with competitors. It's irreparable because the loss of market share is something you can't get back. It's irreparable, most importantly. It's a difficult thing to calculate, but it was measurable. They specifically said that in the opinion. I understood your brief to be arguing that you can't qualify Novartis by talking about brand loyalty. That's error. And I didn't see you acknowledge any other way to qualify Novartis and to acknowledge that lost market share might not always result in irreparable injury. So when does it? You look at how difficult it is to quantify? Difficulty is the most important part of the standard, right? You can also have irreparable harm based upon the fact that someone's market has been disrupted and changed in a way that can't go back. So just as an example, not our situation here, but you have cases even where it's a very easy calculation. They say you lost this customer and this contract is exactly this much. In cases, they also look at, well, what was the long-term impact of that on the plaintiff? Is there something they can't get back? Those are the ones where someone had to lay off an employee or something like that. But the threshold inquiry always is, is it difficult? If it's difficult to calculate out and you're not confident, there's a likelihood, right? We're talking about a likelihood standard. If there's a likelihood that the plaintiff will not be fully compensated by monetary damages, the standard is met. I see that I'm over my time. Okay, you reserve time for rebuttal. We'll hear you later. Thank you. Thank you, Your Honor. Mr. Scott. Good morning, Your Honor. May it please the Court. Hagan Scott for SAMHSA and BioEpis. The district court reasonably found that Janssen had not made the clear showing that they were likely to suffer harms that could not be compensated with money damages, which is required to obtain the extraordinary and drastic remedy of a preliminary injunction. I think, Your Honor, Judge Harden was correct. I think you said this also, Judge Krause, to some degree. This was essentially a battle of the experts, but one where Dr. Popovian, Janssen's expert, largely corroborated the analysis of Samsung's expert. That is to say, both showed in certain ways that any harms here could be calculable. Well, your friend said that calculating it in terms of diminution of market share is not the same thing as calculating money damages. That seems like a logical position. Why is she wrong? I'm not sure it is, Your Honor, because in the end, the way Janssen or any pharmaceutical company makes money is by selling drugs. If they sell less drugs, they make less money. If you can give them the money they would have made by selling, in this case, Stelara, then you've compensated them. Now, there could also be price erosion. But the district court here said there had been no submissions on price erosion, and there was no submission on price erosion. To the extent there was price erosion in the Humira example, there's no reason that also can't be quantified. You can say, well, now you're selling units at less dollar value. But between those two things, you can calculate a dollar value. And I think that pushes my friend into cases that are not about that sort of harm. So she cited two cases which she said supported this difficult standard. The first is BP Chemicals, which does include the three words difficult to calculate, and that's what you see appear in the briefing. But the full sentence is, such injuries to reputation are difficult to calculate, and thus money damages are an inadequate remedy. And I think the court will see this again and again. When there's a difficult to calculate expression by a court, it's referring to a type of harm that is inherently difficult to calculate. So those cases seem to be referring to things like goodwill and reputation. But isn't the concern there that the false statement or whatever the challenged action is, is having an effect on the market, on customers, and customer relationships in a way that can't be quantified? They've argued here that that alienation of customer relationships would be happening because of the nature of the vertically integrated PBMs here. So why isn't that right, that it's analogous in terms of the permanent effect on customer relationships? And maybe it's not reputation per se, but aren't both of them getting at the concern about the permanent severing of customer relationships? Well, I think Your Honor is correct that customer relationships is another one of these categories the court will repeatedly see, which can be under the facts of a case in irreparable harm. I think Your Honor is also correct when you said they argued here that there's damage to customer relationships. And they have put that in their appellate briefing. That did not appear before the district court. And that's why they didn't argue it. They just said two things. They said loss of market share and negotiating power, because that was the only two things they suggested in the district court. There's also reason to believe that's not the case. This actually was addressed by Dr. McDuff, our expert, because we didn't know everything they were going to say. And essentially here you're dealing with a system where, unlike the Novartis case, where people are literally buying the familiar brand of Maalox off the shelf, customers are not getting their Stellara or Stellara Biosimilar because they see the bottle and they know the bottle and they trust it, and therefore could be influenced by false statements. It's prescribed through doctors and the like. So there's no reason to think there'd be the same sort of customer relationship fear. More to the point, they didn't meet their burden on it. It's never come up before. There's no showing on it, no evidence, and so on. I think, Your Honor, that brings in the second case they relied on, 22nd Century, for this difficult standard. And it's another area where you just have to read two sentences to know they're wrong. I think my friend was correct that that case did not involve only reputation and goodwill. I would also regard this question of program access, and here's what this court said about that. At stake here is not only work from the farm loan program, the value of which is easily expressed in monetary terms, but also 22nd Century's reputation and goodwill, which are not. So, again, you see there are some types of harms that are hard to calculate, and those can support a preliminary injunction. But that's not what's at issue here, and they don't have a case for the difficult-to-do-the-math standard. That is just not something courts have said. And just to cite one more case on this, this is the Federal Circuit in a published opinion, Nutrition 21, which said that the difficulty of calculating losses in market share does not amount to proof justifying the extraordinary relief of an injunction prior to trial. Indeed, the district court's reliance, because in that case an injunction had been granted, on possible market share loss would apply in every patent case where the patentee practices the invention. And that's really the bottom-line problem with their submission, is it's fundamentally inconsistent with the rules of equity, which say you're not going to have per se rules. You're not going to have a circumstance where you're normally going to get an injunction. Injunction is extraordinary. It exists when remedies of law don't work for some exceptional reason. And they're essentially trying to make the submission the Federal Circuit already rejected, which is that you're just going to get them in those cases. It's also inconsistent, I should say, with numerous decisions of this court, Frank's GMC, Asierno, more recent unpublished opinions such as Checker Cab, in which this court has seen market share loss, not questioned that it occurred, but said, look, this can be remedied by money damages. So there just isn't going to be a per se rule here. That puts them back where they are in front of the district court, a very fact-specific standard reviewed for abuse of discretion. I'll start here. Go ahead. Your colleague on the other side of the aisle has argued that in terms of the lost market share, it could be calculated looking backwards, but it's not quantifiable in this novel marketplace with biosimilars going forward. What's your answer to that? So I suppose two answers. One, I think that is somewhat addressed by the Nutrition 21 opinion I just discussed, which is, again, it can't be the case that a marketplace is inherently so complex that you just will always get a preliminary injunction. But, two, to the extent that's true, it's a very fact-specific argument, right? You have to look at the marketplace, you look at the particular drug, the particular circumstances, and decide whether that's going to be true here. And the district court reasonably said it's not, based on pretty well-developed expert testimony. I also think Your Honor's question got a bit at one of the logical errors in their submission, which talks about prediction. We're not talking about prediction here. It may be hard to predict where we are right now, what the market share loss will be. I can't tell you what the stock market will be next month, but I can very easily tell you what it was last month. And that's not because it's a simple calculation. Calculating the total value of all the stocks in America is very hard, but the data is measured, it's recorded, a lot of analysis is put in. And I think what the court sees from both the experts is the same thing is done in the pharmaceutical industry. If there is the data, the analysis, and so on, at least looking backwards, were Janssen to somehow prevail at trial, at least looking backwards, they could easily calculate a reasonable number. And, to be clear, we don't have to show easily. The burden is on them. And what this court said in Asierno is that an inability to precisely measure financial harm does not make that harm irreparable or immeasurable. Like Dutch Harteman said, you can definitely use round numbers. This court routinely upholds damages awards and says as long as it's not conjecture speculation and is a reasoned estimation, it's appropriate. So if you win this appeal and it goes back, you're going to be arguing the damages are too speculative and you don't owe them anything. I think we'll be arguing about what the damage figure is, but that's only, of course, if we lose a trial. And this court can affirm, the district court on any basis of the record, and I'm happy to talk about why we're, in fact, correct on the merits. There's no reason to get to the merits if we agree with you on the absence of irreparable harm or that the district court didn't err in denying the injunction. So that's completely correct. It's a very deferential standard review. This court routinely affirms on a single factor, and here I don't see any reason why the district court's opinion is not worthy of that deference. I suppose if I'm going to make that case, I should briefly address negotiating power, since my friend did. So the district court said that the assertions of negotiating power were speculative, and that was a reasonable reading of the record. What my friend just said about the sword of Damocles was essentially all they offered the district court. That is to say, their expert had a lot of expression, sword of Damocles, gun to the head, under the shadow. That does not make out a concrete showing of irreparable harm from negotiating power. If you look at the cases in which courts found irreparable harm from negotiating power, there are cases like Brady v. NFL, and yes, that is Tom Brady against the NFL. It's the 2011 NFL player strike, and in that case, the district court had issued an order that would essentially effectively end the strike in the player's favor. The district court order that was being examined for irreparable harm eliminated the league's ability to lock out the players, which was their principal, perhaps only source of leverage in negotiations. Negotiations were ongoing, and the district court had a thoughtful, factual opinion explaining its views, and the circuit court looked differently and said, look, if you end the lockout, all kinds of things that can't be unwound are going to happen. Not market share losses, but things like player trades, that you just won't be able to figure out what the world looks like in the absence of those. Something like that might support a finding of irreparable harm, but here, where the submission was essentially, well, there will be cascading effects in the future, is not going to make out the clear showing that they have the burden to make. And I can see the court may not want to hear from me on the merits, but I'm happy to address them if the court will allow me. We know what you wrote in your brief on that. Thank you, Mr. Scott. Appreciate it. Let's hear rebuttal from Ms. Glassman. Thank you, Your Honors. I would like to address an omission in my colleague's description of 22nd century. The portion, I believe, after what he read, this is on page six, because other contractors are also competing for work, it will be challenging for 22nd century to show what projects it may have been awarded, or what it may have been in the absence of the misconduct. That is exactly the situation that we have here. That's this circuit explaining that when it's difficult to calculate out what the loss is, when it's difficult, also there you have the negotiation power situation going on as well. That is the quintessential situation of irreparable harm. I'd also like to pick up on something. Before you change topics, just, so how do we decide how difficult is too difficult? I mean, it might be too difficult for Joe Schmo on the street to calculate the loss, but if you get a couple of PhD economists to testify, then maybe the court can figure it out, right? And so isn't that why we defer to the district court on findings like this? If the district court had actually gone through the difficulty analysis, you might have a situation where you would defer. Here, where do you draw the line on difficulty? Here, we're way over whatever that line would be, because the district court itself actually found not only that we had a complex pricing situation, that we had multiple different competitors coming in and out, but that, in fact, we have a completely new type of economic actor we haven't had before. And I think to pick up on Judge Freeman, your point, but also opposing counsel said, well, hey, no problem. At the time of trial, we'll see what the market share is. And notably, I think he didn't dispute that they are going to vigorously, vigorously contest whatever damages model we put in, but it doesn't end at the time of trial. He acknowledged that when we go forward and we look at what's the future negative effect, that's something that even Samson acknowledges is extraordinarily difficult to predict. So even if we get to trial, and even if we put all of the burden of that difficulty on Jansen of calculating out exactly what's the dollar figure of what has happened so far, the future damages, as Samson's counsel conceded, we don't know how to calculate those in a way that we can be at any level of confidence will fully compensate Jansen. That's where modeling comes into play. And Dr. McDuff, using generics, came up with models. The district court reached the conclusion that that was more persuasive than your expert. Why shouldn't we defer to the district court's determination as to which expert it believed? Respectfully, Your Honor, Dr. McDuff didn't come up with any kind of damages model, and the district court didn't endorse any damages model. Dr. Popovian simply said, we can see what the market share is at one point in time, and we can see what it is at another. And that's correct, but that doesn't do anything to help us with the fact that it's going to be extremely difficult to try to fully quantify the amount of damages, and that no amount of damages awarded is going to be able to address the fact that the market itself has been permanently disrupted, that our own negotiations with the PBMs, that our own relationships with our customers have all been changed. And the point about the customers, there's absolutely evidence in the record. In fact, I don't think it was disputed below that this will impact relationships with customers. We need look no further than the actual label for the product. This is a maintenance product that people use for long-term treatment of situations like IBD or psoriatic arthritis. It's a maintenance drug. Once somebody has been essentially forcibly shifted to the new private label product, of course that's a loss of a customer relationship. You may have somebody who is extremely happy that Stellara was keeping these difficult long-term conditions in check, but once they've been forcibly shifted to the new product, that's extreme damage to the relationship. We're very unlikely to ever get that customer back. Isn't the real problem there the end of exclusivity and all these other biosimilars that before are already on the market, more are coming on the market? Well, that's one of the reasons why the damages model becomes extremely complicated. So you're going to have any number of physicians and patients who would strongly prefer to stay on Stellara and trying to measure out how many of those folks would have stayed on Stellara in the absence of the breach versus how many of those folks would have left for some other reason. Either they weren't as happy or because of the pricing or otherwise. That's one of those things where you get into a situation of a damages model that's very difficult, as the case law talks about. And the preliminary injunction standard talks about difficulty because once you put that all on the plaintiff and you say, well, you can get it back at the end if you're able to fully quantify it in your model and if the other side doesn't attack it and if the jury and the court ultimately award it, now the plaintiff's lost right from the get-go because the very, very best they can ever do is get back their actual past losses. And they face a likelihood, which of course is the standard here, a likelihood that they're not going to get a substantial portion of that back and virtually a certainty that they're not going to get it all because they're going to be left at the end of the day with this disrupted market. So I see I'm well over my time. I don't know if the panel has more questions. Thank you very much, Ms. Glasser.  Thank you to counsel for both sides. The court will take the matter under advisement.